Good morning, Your Honors. May it please the Court, Ken and Kater, for the appellants. I think what we have here is a finding of contempt of contract. Can I ask a preliminary question? Certainly, sir. Is StarTech in bankruptcy? No. Has the judgment been paid? It has not. Or any part of it? It has not. Okay. None of it's been paid. That's correct, Your Honor. We believe that Mr. Ballaghan believes that it is. And that's what he told the Court. Okay. I think what happened here is that the judge fundamentally misunderstood the settlement agreement. The settlement agreement provided that Mr. Ballaghan and StarTech defendants were to return the supposedly offending cartridges found on April 2nd. But he didn't, right? He says he did not return the precise cartridges that were found by the inspector. That is the issue. Where did they go? He says he sent them back. That is Back to whom? Back to SECO. That's the issue in the case. What those cartridges were was never established. It was never stipulated to. It was never established as a matter of proof. It was never agreed to. That's why the settlement agreement says send back the cartridges. It doesn't say what cartridges. It says send back the cartridges. Ballaghan sends back the cartridges. Epson says they're the wrong ones. But it's never been established what it was other than Epson's own self-serving testimony. So Ballaghan StarTech let the inspector in who looked at the entire inventory, right? Correct. And wrote a written report, right? No. He made handwritten notes. All right. Nothing surfaced later until the contempt motion four years later. Was there any evidence before the trial court as to what the inspector found? No, sir. Other than in the affidavit to support the contempt motion. And that was the whole issue in the case. That what sites found in April of 2002 was never conceded to by the That's why the settlement agreement says he's going to send the cartridges back, but doesn't say what cartridges they are. So when the trial court said you're in contempt for not sending back the cartridges found on 2002, Ballaghan The settlement agreement was reduced to an order. Is that not correct? No, sir. The settlement agreement, the order, the consent decree and permanent injunction said basically you shall not violate the Lanthem Act. And secondly, the court retains jurisdiction to enforce the terms of the settlement agreement. The settlement agreement is not incorporated into the consent decree. There is no order that's been violated here. Ballaghan insists that he complied, that he sent back the cartridges that were there that day. The problem is that we never got a hearing on what those cartridges were. That's what he wanted to do. The judge assumed that Epson's declaration about what happened on April 2nd, that 2002, was correct without cross-examination. Ballaghan was prepared to challenge that. So you end up with being found in contempt for an alleged breach of a settlement agreement, which is a contract. And then the problems cascaded from there. He was given a choice. Either send back the cartridges, which he said he had already sent back, or pay $38,000 in damages. Well, and if you don't do either one within five days, it's going to be $500 a day until you do. Well, he couldn't send back the cartridges because he said he already did. There was no evidence to the contrary. So he had to pay the fine. But he couldn't pay the fine. And he said he couldn't pay the fine. You mean the contempt fine? Correct. The $38,000. Well, that's a money judgment for the value of the product, is it not? Yes. It's a contempt fine based upon a money judgment for the value of the product, getting back to, accepting what Epson said, which was the defeat. The trial court, Your Honor, didn't know what that product was. That was the whole issue in the case. If the settlement, the contempt finding would be correct if, if the settlement agreement spelled out what cartridges were found on April 2nd, value  Bellagam signed it and said, I will send those cartridges back to you. It didn't. It just said send back the cartridges that were found on April 2nd. He says he did that in 2004. Epson says he didn't. That was the whole issue in the case. Epson said he did it by comparing serial numbers. Based upon what they say they found on April 2nd, which was never corroborated and never have been corroborated...         And if you see a Serial Number, a Suggested Figure. Okay. They are repeated. They are repeated. So you know all of that from the beginning. Are you going to wait for me to ask the question? Excuse me? Are you going to wait for me to ask the question? I am sorry, Your Honor. The court found that there was a, that he didn't return the Serial Numbers that were found in his affidavit, but he did not provide anything other than a general statement, I've sent everything I've got. Did he dispute in his affidavit, did he dispute the allegation, the statement of the inspector who said, I wrote down these Serial Numbers and these Serial Numbers don't match what we got back from Baloghain? What he said in his declaration was, what the Serial Numbers the inspector says he founds on April 2nd, which ones are counterfeit, is wrong. And he wanted to cross, we wanted to cross-examine the inspector. We didn't get a chance to do that. Do you think that's enough saying, yeah, yeah? You know, why is that enough? I mean, they have come forward with evidence from somebody who reports to have been on the scene and have written down lists of Serial Numbers, and your client can't just come back and say, well, no, I want a chance to cross-examine him. Why doesn't he have a responsibility to come back with something to say, no, I, those Serial Numbers that he wrote down were wrong, I never had those Serial Numbers, or I did in fact send the Serial Numbers and he is now lying when he says, I didn't. Can he get away with just a, for purposes of the Celotex, just a general denial is not enough. He has to come forward with evidence that creates a tribal issue of fact. And as best I can tell, we just didn't meet the Celotex standard. Specific evidence on the one hand, and a general, nah, I don't believe it, and I want a chance to, you know. That used to be okay before Celotex, but Celotex was a long time ago. Your Honor, the settlement agreement provided that the remedy for a breach is a reinstatement of the action. Now again, we didn't have a chance to do any discovery, we didn't have a chance to probe into. That's a different argument, and not a very good one. If you want to change the subject, that's okay. I was asking you a question about what your client's duty was in creating a tribal issue of fact that would entitle him to a trial on this issue. And if you sort of want to not answer that, that's okay, we can go on, and I can show you why you're mistaken about the other point as well. But I'm just letting you know that you didn't give me a satisfactory answer to the question I did ask. The only thing that the defendant could do was dispute the truth of what sites the inspector found. Absolutely right. He could dispute the truth with a different truth. He can't dispute the truth by saying, I don't believe it, and I want a chance to cross-examine him. That's not good enough. Well, what he has to say is, look, I've got records of my own, and I was there when the guy inspected. I wrote down serial numbers as well, and here are the serial numbers that I wrote down, so the guy is wrong. Or say, I have invoices. I have invoices from a reputable dealer, and the reputable dealer shows invoices with serial numbers and model numbers, and so here are different numbers. That would be a refutation, saying, no, I don't believe it, I want a trial is not a refutation, and it's just not good enough to avoid summary judgment, which is what happened to your client. He got summary judgment against him under a, you know, the standards now acceptable in Federal court. Well, Your Honor, I would respectfully disagree that this was a summary judgment. It was a contempt. The evidentiary standards of a summary judgment were not. No, of course it was a contempt, but you can either have an adjudication by a trial, or you can call it a trial, or you can call it a hearing, but essentially what it is is you get witnesses in court who testify, and so on and so forth, and get cross-examined. That's generically a trial. Or you can have adjudication on the papers, and that's generically a summary judgment. I understand this is not summary judgment, this is contempt and whatnot, but the essence of proceeding is summary judgment. You are not resolving by trial, you're resolving on affidavits, and the procedure applicable to resolving things on affidavits is sent out in cellotex, and you need to come forward with quite a bit in order to get the benefit of a trial. I just don't see where your client came up with anything. Well, we didn't think that that was the applicable standard at the time, Your Honor, especially since the settlement agreement provided for reinstatement of the action, where we could have explored what the inspector found in 2002. It's one possibility that the relief and settlement, certainly that was an option for Epson, but not an option for you. It allowed them to reinstate the action if they chose to reinstate the action. It certainly did not say that in order to find a contempt, you have to reinstate the action. The settlement agreement clearly said in the order, clearly said that the court retains jurisdiction to enter contempt for this. The court retained jurisdiction to enforce the settlement agreement. The settlement agreement, a contract provided for reinstatement of the action in the event there was a factual dispute, and that's what Baligam was relying on, that the action would be reinstated. Beyond that issue, the court did not take into account Baligam's inability to pay, and he was therefore, and since he couldn't ship the cartridges back, since he said he already had, he had no choice other than to pay the fine. Let's look at the possibilities. It's possible that your client was lying. That he had the cartridges, and he just didn't want to send them back. That's possible. He said he didn't have them, but people have been known to lie. The second possibility is that he sent back everything he had, and he had nothing more to send, and the reason for that was that in the meantime, he had sold the cartridges that the inspector had determined were fake. The third possibility is that he sent everything back that he had, and the reason the numbers didn't match is that the inspector was wrong or was lying about it. Those are the three possibilities. It seems to me only one of those possibilities puts you in a situation where you can say, look, I can't pay. The only option I have is to pay. That's correct, your honor. How do we know that's a possibility? I'm sorry, one of the three possibilities. Right. The third possibility that you mentioned, that the inspector got it wrong, that Ballagham did in fact send the same cartridges back that were found on April 2nd. Then he's left with a flat fine, that he can't purge it. Okay. That there's no way to purge. The judge gave him the option to send the cartridges back, pay the money. He couldn't do either one. But did this judge seem to think that he in fact, he had the cartridges and he was just being mischievous? I gathered that, your honor, and I would submit that's pure supposition, that there was no evidence of that. Some call it supposition, others call it fact finding. It's a fine line. But if it's a fact finding, then it needs to be reviewed for abuse. Where, he didn't hear anything. Oh, but they're so mistaken. A fact finding is an abuse for substantial evidence, the lowest standard of review known to man. If there's substantial evidence, if there's a little bit of evidence supporting it, that's enough. Isn't there a little bit of evidence supporting it? There is, I'd say, not much. You have to make an assumption. You have to make an assumption. You have to assume that the inspector was correct. You have to assume that Ballaghan was lying. Because he didn't submit his own receipts, his own proof of purchase of what these cartridges were at that time. He had submitted, in accordance with the settlement agreement, all of his accounting records. They didn't put those in evidence. He just was relying on the fact that he put these things aside, and when it came time to send them back, he did. And then, by the time of the order, there was nothing more to send back. So, if he can't send anything back... He didn't send some back that weren't on the inspector's list? That's what Epson claims, correct. So, he had no choice, and he has no choice up until today to pay this coercive fine with money that he does not have. And I don't think that it's consistent with the cases on contempt. I think it's a flat fine. Thank you. Good morning, Your Honor. Sherry Eisner for Seiko Epson and Epson America. Are you planning to collect $300,000 or $400,000 from this man? Well, the only thing... You can't squeeze blood out of a stone, can you? The only thing... First of all, we don't know it's a stone, and we disagree that it's a stone. But the only thing that Epson's entitled to is the $38,000, the $500-a-day fine was ordered payable to the clerk. Oh, it's for us. Yeah. And it's not a stone, so you still have a chance. Buy a nice Epson printer with this. And some genuine cartridges. And some genuine cartridges. I think there's some very important points that Your Honor already touched on. And the first, that there was a specific court order that was violated, and that was So that was the time to come forward and say, hey, wait a second. We don't have those cartridges, or we can't comply, or you're mistaken. Something. Nothing. They did not oppose. But we had to go to court, and we had to get the order. It was that order. Did they know at that point what it is that you all claimed that he had that was fake? Did you give them a list? Yes, I think that they did know. I think that, if I'm not mistaken, the Sykes Declaration was certainly put forth before the contempt application. But also, we have a TRO. We have a preliminary injunction that they stipulated to. And we have repeatedly in the settlement agreement and other documents referenced to the counterfeit cartridges that were inspected in detail back in April 2002. At no time. They didn't, appellants didn't serve any discovery. They certainly didn't respond to our discovery, and Epson had to go in and get another motion to compel. Everything was deemed admitted. We were awarded sanctions. You know, you've said a lot of words, but I'm still waiting for the answer to my question. I apologize. Whether or not they had a list of what it was? Yes, I think that they did, and the Sykes Declaration was submitted earlier. I think, I always say, that's not an answer. That's a hedge. Yes? No? I don't know. Yes. Let's try one of those. Okay. Yes. Where? First. Tell me more about that. First, when Mr. Sykes, as he explains in his declaration, went there in April of 2002, he explained to the defendant what he found and what was counterfeit and offered to take possession. He then served them with a TRO, telling them to hold it and not do anything with it. And I think it's important, and Your Honor touched on it. I'm looking for the word list in your answer. Until I hear the word list, I'm going to be... Well, I think he listed it right when he was there with them, inspecting them. They were there. And he describes telling them what was counterfeit in his declaration. And I believe, and I can check in the record, that the declaration... Did he give them a list? The declaration with the list... Did he give them a list? Yes. Did he say, look, I have been here, and here's the list of cartridges that I've discovered are counterfeit? Yes, he does that in his declaration, which I believe was submitted as early as April 2002 with respect to the preliminary injunction motion. Can you find that in the ER or supplemental? I will find that for you. It is... Just a moment, I'll confirm. Declaration of Mr. Seitz is... Tab 6. Supplemental... Of the supplemental, tab 6, page 51 to 111. Fine. That's a lot of territory. I don't have a way to search for the word list here, so tell me when that's a declaration. And I will. In Mr. Seitz's declaration that is under tab 9 of the supplemental excerpt, and then it's exhibit C... Okay. Supplemental declaration of Herbert Seitz, order to show cause for a preliminary injunction, filed April 1802. Paragraph... Well, it goes through everything that he found, and I think it's paragraph 4. The following cartridges were determined to be counterfeit, and there is the list. Model numbers and the numbers of cartridges. And it was this declaration that was before the appellants and before the court when they stipulated to the preliminary injunction. So as early as April 2002, appellants knew exactly what Epson and Mr. Seitz claimed to be counterfeit. And at no time did they oppose that. So April 18, 2002, what had happened, where was the litigation at that point? The TRO had been entered, and this was with, in connection with seeking a preliminary injunction. And there was never a hearing because the appellants agreed to the preliminary injunction and stipulated to it. So this declaration was submitted in order to get the preliminary injunction. Okay. And then the settlement agreement happened... The settlement didn't happen until late 03. So thereafter, we get the preliminary injunction. We then go through and serve discovery, which wasn't responded to. It's in that discovery that there's also admissions with respect to what was counterfeit. And those were not responded to. The court, after a motion to compel, had to deem those admitted. So, although they had many opportunities, they did not contest what was seen in April 2002. And another important point that Your Honor touched on at the beginning was, now that we know that there was an order that was, in fact, violated, and that's really what the court was finding contempt, the idea of ability to comply. Now, where and when that ability to comply comes into play, we probably disagree, but the bottom line was there was no evidence of true inability to comply. And there was no evidence that they were bankrupt, insolvent. All we saw was a belated attempt to say, I work part-time, I don't have a house. None of those things mean your company doesn't have money. And as a matter of fact, in the record, there was significant evidence that they were a viable business. Because they returned to Epson what was supposed to be the counterfeit cartridges, turned out to be mostly genuine cartridges that the court found, or that appellants claimed was worth between $25,000 and $29,000. So they had stock on hand worth almost enough to pay the compensatory sanction that they were eventually told to pay. Why don't you say, okay, we're happy, we've got $29,000 worth of cartridges, close enough. We'll, we'll, what happened to those cartridges? Two things. One, under the settlement agreement, Epson was required to return any cartridges that we found to be genuine. So the idea was, you're going, appellants, you have to return the counterfeit cartridges we saw in April 2002, anything else you have, because we get to check and see if it's counterfeit or genuine. But if it's genuine, we give it back to you. So that's, yes, we were ordered to give it back, and we did. So we didn't have them. And two... You should have just kept them. You know, lawyers are supposed to be there to solve problems, not to create problems. Just say, look, we'll hold on to these cartridges, let's call it quits, and, you know, avoid borrowing... Perhaps, perhaps, they had offered... ...borrowing Mr. Corley's Ninth Circuit with, you know... Perhaps if they would have offered that as compensation, maybe that would have worked. But the key was, we needed those counterfeit cartridges off the market. Those caused harm to Epson, and that's where this was all coming from. Obviously, they didn't have them anymore. He probably got rid of them, and, you know, what are you going to do? Perhaps not. No, but you were to get the counterfeit cartridges, were you? Absolutely, yes. The counterfeit cartridges were to be returned to us, and then... The counterfeit cartridges went back to the entity that supplied the counterfeit cartridges. Well, that was the allegation, was that... No, that's just the settlement agreement. You didn't supply the counterfeit cartridges to them, did you? No. Well, the settlement agreement says the following cartridges are determined to be counterfeits. He said, I suggested I'd be willing to take care of them. I then requested that he provide them in the name of the... Somewhere, I thought I saw... Yes, you're thinking of Mr. Seitz's declaration where Mr. Seitz declared that he told them of the counterfeit cartridges he offered to take them back, and that appellants said no, they had planned to return them to where they got them because they wanted a refund. So, appellants wanted to get their money back for having counterfeit cartridges that they weren't going to be allowed to sell based on the court's order not to sell. So, they were supposed to turn the counterfeits and the real cartridges over to you, both? They were basically supposed to send us anything in their inventory, and that was supposed to... It could have just been if all they had... So, you got the real cartridges, but you didn't get the counterfeit ones? We only got... There were a few counterfeit in there. Basically, we did not get... I think it was over 1,300 cartridges that had been seen in April 2002 were not returned to us. With no explanation... Those were all counterfeit? Yes, absolutely. And there was no explanation. For example, I think one of your honors pointed out, you know, the declaration could have said, we kept them in a corner, they were locked up, these are the ones I sent you, here's my proof, here's my record keeping, nothing other than I believe I sent you what I was supposed to send you. The court certainly was reasonable in either not believing them or just having not enough evidence in front of them to determine whether or not they could or couldn't return those. Now, how about the... I mean, it seems to me that the amount that the court assessed per cartridge was a little on the high side. Why does Epson get the retail price? Well, the court had before it... I believe that the retail price is exactly appropriate in this case, and the court had a choice. When Epson sells a cartridge, it doesn't pocket the retail price, does it? Epson does sell in the retail market, and the district court found evidence of that, we submitted a declaration. So, for example, Epson has its own online store, and you can go online and you can buy a genuine cartridge directly from Epson, and that's a retail sale. And Epson has a magic wand where you can make another cartridge appear at no cost, which can then sell at the full retail price with no expenses for sales expenses or advertising or manufacturing? The court took that into account, and the district court specifically addressed that fact and said, one, there was evidence of wholesale prices and retail prices. They didn't have evidence of expenses, but he chose the retail price. One reason was because Epson sold in the retail market. And the other, making up perhaps for the difference in expense, was that a sale of a counterfeit cartridge directly harms Epson. It harms their reputation, dilutes their trademark. It makes customers unhappy when they buy what they think is a genuine cartridge. It's counterfeit. It doesn't work right. It doesn't work as well as they want it to. All of those things harm Epson. So the judge said, I'm not going to use the wholesale price. I'm going to take the retail price because there's evidence of it, because there's no contrary evidence that we sell in the retail market, and because it's going to help compensate Epson. Because if you don't return the cartridges, then my only logical inference is that they're out on the retail market, that you sold them, thereby causing harm to Epson. And so the retail $38,000 was entirely appropriate and not punitive in any way, because he certainly didn't tack on anything extra. He didn't double it. He didn't triple it. He didn't do anything extra to punish them other than to try to compensate Epson for the contempt. And so the compensatory, entirely appropriate within the court's discretion, certainly not an abuse of discretion. Did you get any of the counterfeit cartridges? I'm sorry? Did you get any of the counterfeit cartridges? I believe there were a few that were returned, and the exact number I think was about in the 60s, and that over 1,300 were in fact missing. And there is a detailed chart. And how do we know that Epson is – I understand it's pretty hard to tell them apart, the counterfeit from the genuine. How do we know Epson didn't make a mistake? Well, the declaration by Mr. Seitz had foundation for his training in how to tell the difference. It's detailed, and there was nothing contrary to it. There was no declaration. There was – from appellants saying, you know, we compared our numbers, or I took notes with Mr. Seitz, and my notes don't match what he says in his declaration. Nothing contrary, and no reason to doubt Mr. Seitz. I understand that point. I went over that point with the opposing counsel. I'm now asking a different question. Mr. Seitz shows up at the warehouse, and he does whatever it is he does, and he says, this is counterfeit, and this is counterfeit, and this is counterfeit. How does the other side dispute that? By taking discovery. And they didn't. They could have deposed Mr. Seitz. They could have served written discovery. They could have responded to our written discovery. They could have denied the request for admissions. But they did nothing. And it's not Epson's fault that nobody challenged their evidence. They put forth the best evidence they had. They laid their foundations, step by step, gave lists and model numbers. But if nobody raises their hand and says, wait a minute, we disagree, what else is someone supposed to do? What else is the party supposed to do? And that evidence was before the judge, and certainly he must have looked at it and said, you know what? This makes sense. All the foundation's there. All the evidence I need. And nobody's saying anything on the other side. Nobody even tried. Instead, I've got a party who routinely doesn't respond to discovery, doesn't respond to my motions, isn't really doing anything, and then settles. Now, Mr. Malaman claims he's destitute. How do we know he's not? Well, first of all, we know he's not because it's his burden to prove that he is. And so if he really was, he has to show that he was. He says he is. Well, he didn't. He said on the oath. He didn't. His declaration, which was submitted only at the time of the motion for reconsideration addressing his finances, it doesn't say he's destitute. It doesn't say he's destitute at all. As a matter of fact, it says I only work part-time, I have health problems, I don't own a home, and I have children. He doesn't say my business is operating at a loss. He doesn't say I don't have a diamond mine in the backyard. I mean, it's possible he won the lottery, and that's why he doesn't have to work full-time. It's possible he's got ten employees. Probably got a heart attack, too. Oh, he won the lottery. But the cases are clear that if he couldn't comply, he had to say so, and he didn't. Okay. Now, assuming he is destitute, let's say we look at the record and we read it differently than you do. Can the district court impose monetary sanctions for failure to come up with a monetary contempt payment that the content nor is unable to pay? I think, excuse me, with respect to the compensatory sanction, the $38,000, I think the answer is yes, he can. What about the per diem? I'm sorry. The per diem is a little more difficult because then we do agree that ability to comply, you have to be able to purge it in order to have the daily coercive fine. And so that would be a problem. The problem is here for appellants, there's no evidence. And certainly every opportunity to present, there's no evidence that they could not pay the $38,000 or turn them over. And in fact, there's contrary evidence. Evidence of stock on hand were several thousand dollars. Evidence of an ongoing business, whatever form that business might be. What evidence is there that there still are counterfeit items in stock? We have no evidence. We have no evidence. We have no idea what they did with the counterfeit. You can turn over something you don't have, right? Assuming that they don't. That there's something to turn over. Correct. We have no proof one way or the other. The counterfeit cartridges could be sitting in their stock room. They could have sold them and they're out in the public. Which is why the judge gave them two options. Either turn it over, in which case there's no damage to Epson because you still have them. Or if you don't have them, I'm going to assume damage because now they're out in the retail world and Epson's being harmed, you have to compensate. Why was no money judgment sufficient to do that? Well, it wasn't. It's not a typical. Excuse me? As far as you're concerned, you're made whole if you collect the money judgment, right? If we collect the $38,000 and the attorney's fees awarded below, yes. And that was a contempt order coming out of the fact that we made a motion under the settlement agreement. Everybody agreed in the consent degree. We can go back to court and get this enforced. What do you make of Shuffler v. Heritage Bank, which doesn't seem to require destitution. It just basically says you can't turn a, you can't use contempt as a way of collecting what's essentially a money judgment. I think that... You're familiar with Shuffler? Yes. And I think that Shuffler, there's two different aspects. And one is whether we think of this as a typical money judgment, the $38,000, if you can't turn it over. But also... No, no. Assuming you can't turn it over. Assuming you can? I don't think there's any requirement that you'll not be able to turn it over. Let's say you can. It's still a money judgment. Let's say you've got nothing but piles of money, but Shuffler seems to say it's a money judgment. And you can't use contempt as a way of enforcing a money judgment. That's what I read. But I think that Shuffler acknowledges that you can use contempt as a way to turn over a money judgment in the appropriate circumstances, which Judge Jones below specifically found here that he had a history that was sufficient. Shuffler's had a history, too. But the Shuffler court, I believe, determined that it didn't have enough to go under unless the court directs otherwise. Whereas Judge Jones in our case did believe that there was enough. That the history of not answering discovery, of not responding to motions, of not obeying the court's TRO, preliminary injunction, consent decree, that all this history and then the contempt was enough. And the lack of evidence about what happened to those cartridges and whether or not they could pay. All of that was enough to say... Those are all interesting distinctions. But that's also like throwing spaghetti on a wall, trying to see which distinction sticks. As I see, Shuffler says, look, if it's a money judgment, you can't enforce it with contempt. The way you enforce it is by using Rule 69A. Thank you. But... 69A... But what? Yeah. I mean, and the way you collect it is by execution. And there are no exceptional circumstances. Seems pretty categorical to me. I mean, why don't you tell me how I would write an opinion riding my way around Shuffler if I were to agree with you. I think that you could write the opinion very much the way Judge Jones addressed it, which was that Shuffler and FRCP 69A say that writ of execution is the appropriate method unless the court direct otherwise. And that sentence has to mean something, that phrase has to mean something, so that a district court has an option when they think they have exceptional circumstances, and Judge Jones here did, that they can go beyond that writ of execution, not force Epson to chase again, to start all over, but to say, you know what, we had a motion to enforce a settlement agreement. I ordered, court ordered you to do something. You didn't do it. You didn't give me a good reason why. You didn't explain that you couldn't do it. And I'm going to make you do it and that this is the appropriate use of my contempt powers with my discretion, even under FRCP 69A. That these are the appropriate exceptional circumstances anticipated by that statute. Thank you, Your Honors. I stand submitted unless you have anything further. Thank you. Just a couple of points, Your Honors. With respect to how do you tell the good from the genuine? We were never shown how that was done. And then she says, well, we could have disputed it in discovery, but that was why the case was settled, because Bellingham couldn't afford to defend. So he settled, but then that's, and that's also why the list is not in the settlement agreement. He was trying to save money. He does say in his declaration with respect to the inability to pay that he can't pay within five days. That's what he was ordered to do. He had to pay it within five days. He said, I can't pay within five days. I just had a heart attack. I got three kids. I don't own a home. I'm working part time. Still haven't paid, though. No. No, because he believes that this is a flat fine. Did he say he was destitute? He didn't use the word destitute, but he said, I can't pay. Well, I can't pay could mean a lot of things. All my fortune is tied up in an expensive trust. I can't pay because I'm too greedy. You know, just, you know, my little greedy heart wouldn't let me reach into my pocket. It could mean a lot of things. It's very easy to say, I, you know, here's my balance sheet. Here's my income tax return. I am destitute. I have no other source of income. He doesn't say that, right? No, he does not say that, Your Honor, but he did say... He could have said that, right? He could have said more. He could have said more. With respect to getting around 60... I mean, it looks really to me like artful drafting. You're going to say stuff that sounds pretty good, but then avoid saying the really key things that matter. Like, I don't have money buried in the backyard. I don't have another source of income. I don't have a trust account. I am destitute. I, you know, I mean, lawyers know how to draft these things and know how to say these things. I don't know how many ways you can say, I can't pay $38,000 in five days. I don't know very many people who can. It's now changed though from I can't to I won't. Well, he believes that... We believe that it's a fine and that he was entitled to a trial on the issue. As to... I just wanted to address briefly the 69A issue. I don't think you answered the question. I'm sorry, Your Honor. It has changed from I can't to I won't. I don't know that there's any evidence of that. Mr. I mean, I could tell you about conversations I've had with Mr. Bell again this week, but I don't know that that's appropriate. I think that there should have been a hearing. The judge should have inquired. That's the best that we can do. Is the sanction dischargeable in bankruptcy? I don't believe that it is, Your Honor. I... This is about affirmative conduct. And to my knowledge, it's not. One last point. There are two other points. We thought... Bell again did pay $14,000, the money required under the settlement agreement. He was given no offset for that in the money judgment. We believe that he was entitled to some offset for that. And secondly, as to the writ of execution 69A issue, the cases, especially Halo v. Marcos, say that extraordinary equitable circumstances have to exist to not use the writ to pay a money fine or a money judgment. I think what happened is that the trial court just didn't like him. And thought he was lying and used the coercive fine to punish him. And that's not what it's for. I think it was punishment. And I think that the panel could reasonably conclude that. Thank you. Thank you, counsel. The case just argued will be submitted. Court will stand in recess for the day. All rise. Mr. Buckley, is there anything you'd like to add? No. Judge, this is for the world to watch. It's not going to matter. Thanks a lot. Thank you. I have Carson. And then Bush, and then Wheeler. Thank you. I'm sorry, it's just we have to have this. Yeah, we're good.
judges: Beezer, Reinhardt,kozinski